**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ERIC BURRELL M.,[1] | ) Case No. EDCV 18-0784-JPR |
| Plaintiff, | ) |
|  | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **AFFIRMING COMMISSIONER** |
|  | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**I. PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed April 8, 2019, which the Court has taken under submission without oral argument.

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

For the reasons stated below, the Commissioner's decision is affirmed.

**II.  BACKGROUND**

Plaintiff was born in 1969.  (Administrative Record ("AR") 63.)  He completed college (see AR 38, 183)[2] and last worked as a special warfare combatant for the U.S. Navy, a position he held for 25 years (AR 184).

On October 15, 2015, Plaintiff applied for DIB, alleging that he had been unable to work since March 31, 2012, because of posttraumatic stress disorder, "sleep apnea," "degenerative disc disease," "patellar sublaxation both knees," "ulnar neuropathy left hand," "medial and ulnar neuropathy r[igh]t hand," "arthritis with superior glenoid[3] left shoulder," "superior glenoid r[igh]t shoulder," "tend[i]nitis left elbow," "patellofemoral syndrome r[igh]t knee," "status post ankle fracture both ankles," "tinnitus," "gastroesophageal reflux disease," "status post healed fifth metacarpal neck fracture," "right great toe arthritis," "r[igh]t ear hearing loss," "Crohn's disease," and "back pain due to broken back in 1993."  (AR 49-50;

---

[2] Plaintiff filled out a report stating that he had completed "4 or more years of college" as of June 2015 (see AR 183), and his attorney noted that he has a bachelor's degree (AR 270).  But he also stated at the April 2017 hearing that Plaintiff was attending the University of Phoenix full-time (see AR 38), apparently for some kind of advanced degree.  In any case, the ALJ's decision considered Plaintiff to have completed only high school.  (See AR 27.)

[3] The glenoid is the socket part of the shoulder joint.  See Shoulder Joint Tears, WebMD, https://www.webmd.com/fitness-exercise/features/shoulder-joint-tears#1 (last visited June 5, 2019).

see also AR 163-69.)  After his application was denied initially (AR 61, 63) and on reconsideration (AR 77, 78), he requested a hearing before an administrative law judge (AR 93-94).  A hearing was held on April 4, 2017, at which a vocational expert testified.  (AR 33-48.)

Plaintiff did not show up for the hearing.  His attorney said that a member of his office has just spoken to him, and he "forgot that the hearing was today."  (AR 35.)  The attorney thought that "we woke him up," presumably shortly before the start of the 11:17 a.m. hearing.  (AR 39; see also AR 35.)  The ALJ noted that that wasn't good cause for failing to appear but sent "an order to show cause" to Plaintiff in case "there [wa]s some other reason."  (AR 36; see also AR 146.)  Plaintiff responded to the order, claiming that he had been there but was told "[his] attorney was already in the hearing" and that he should "leave."  (AR 149.)  The ALJ determined that "[t]here is no evidence to support that [he] appeared at the hearing office on the date of the hearing," noting that "he never signed in as per office policy" and that no attempt had been made to notify her "through instant messaging" that Plaintiff was there, which is office policy "even if the claimant arrives late and the hearing has begun."  (AR 16-17.)  Thus, she found that his "failure to appear . . . [was] without good cause."  (AR 17.)

In a written decision issued September 29, 2017, the ALJ found that Plaintiff had not been disabled since the alleged onset date.  (See AR 28; see generally 16-28.)  Plaintiff requested review from the Appeals Council (AR 150), which denied it on February 14, 2018 (AR 1-3).  This action followed.

# III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

# IV. THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to

4

last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.
1992).

A. <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§ 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th
Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the
Commissioner must determine whether the claimant is currently
engaged in substantial gainful activity; if so, the claimant is
not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine
whether the claimant has a "severe" impairment or combination of
impairments significantly limiting his ability to do basic work
activities; if not, the claimant is not disabled and his claim
must be denied.  § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments set
forth at 20 C.F.R. part 404, subpart P, appendix 1; if so,
disability is conclusively presumed.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments
does not meet or equal an impairment in the Listing, the fourth
step requires the Commissioner to determine whether the claimant

has sufficient residual functional capacity ("RFC")[4] to perform his past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 404.1520(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.  The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff met the insured status requirements through December 31, 2017, and had not engaged in substantial gainful activity since March 31, 2012, the alleged onset date. (AR 19.) At step two, she determined that he had severe impairments of PTSD, depressive disorder, alcohol abuse, degenerative disc disease of the lumbar spine, and "sleep apnea with CPAP." (Id.)

At step three, she found that Plaintiff's impairments did

---

[4] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see also Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

not meet or equal a listing.  (AR 19-21.)  At step four, she concluded that he had the RFC to perform modified light work, limiting him to

> lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking 6 hours in an 8-hour workday and sitting 6 hours in an 8-hour workday with normal breaks; never climb ladders, ropes and scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; occasional exposure to excessive vibration such as construction vibration; no use of moving hazardous machinery such as construction machinery or in manufacturing with large moving parts; no exposure to unprotected heights; can perform unskilled work at all reasoning levels appropriate for unskilled work; occasional superficial interaction with the public; and occasional interaction with co-workers.

(AR 21.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could not do his past relevant work.  (AR 26.)

At step five, she found that given Plaintiff's age, education, work experience, and RFC, he could perform at least three representative jobs in the national economy: "housekeeping, cleaner, DOT 323.687-014," 1991 WL 672783 (Jan. 1, 2016); "[b]attery inspector, DOT 727.687-066," 1991 WL 679675 (Jan. 1, 2016); and "[g]arment folder, DOT 789.687-066," 1991 WL 681266 (Jan. 1, 2016).  (AR 27.)  Accordingly, she found him not disabled.  (AR 28.)

**V. DISCUSSION**[5]

Plaintiff argues that the ALJ failed to provide "specific and legitimate reasons to reject the mental limitations assessed by the psychological consultative examiner" or "clear and convincing reasons to reject [Plaintiff's] subjective symptoms." (J. Stip. at 4; see also generally id. at 5-8, 12-17, 22-23.) For the reasons discussed below, remand is not warranted on either basis.

A. The ALJ Properly Assessed the Consulting Psychologist's Opinion

Plaintiff argues that the ALJ improperly gave "some weight but not full weight" to psychologist J. Zhang's opinion. (Id. at 6.) As explained below, the ALJ appropriately found that Dr. Zhang's opinion merited only "some weight." (See AR 26.)

1. Applicable law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. See Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining

---

[5] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause. To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings. (See AR 33-48, 150); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also generally Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings), cert. denied, 139 S. Ct. 2013 (2019).

physician's, and an examining physician's opinion is generally
entitled to more weight than a nonexamining physician's.  Id.;
see § 404.1527(c)(1).  This is so because treating physicians are
employed to cure and have a greater opportunity to know and
observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th
Cir. 1996).  But "the findings of a nontreating, nonexamining
physician can amount to substantial evidence, so long as other
evidence in the record supports those findings."  Saelee v.
Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as
amended).

The ALJ may disregard a physician's opinion regardless of
whether it is contradicted.  Magallanes v. Bowen, 881 F.2d 747,
751 (9th Cir. 1989); see also Carmickle v. Comm'r, Soc. Sec.
Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  When a doctor's
opinion is not contradicted by other medical-opinion evidence,
however, it may be rejected only for a "clear and convincing"
reason.  Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164
(citing Lester, 81 F.3d at 830-31).  When it is contradicted, the
ALJ need provide only a "specific and legitimate" reason for
discounting it.  Carmickle, 533 F.3d at 1164 (citing Lester, 81
F.3d at 830-31).  The weight given a doctor's opinion, moreover,
depends on whether it is consistent with the record and
accompanied by adequate explanation, among other things.  See
§ 404.1527(c); see also Orn v. Astrue, 495 F.3d 625, 631 (9th
Cir. 2007) (factors in assessing physician's opinion include
length of treatment relationship, frequency of examination, and
nature and extent of treatment relationship).

An ALJ need not recite "magic words" to reject a physician's

9

opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. <u>Magallanes</u>, 881 F.2d at 755. The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

    2.  <u>Relevant background</u>

    a.  *Plaintiff's mental-health treatment records*

Plaintiff was apparently first prescribed Cymbalta[6] on June 26, 2013, likely by osteopathic doctor Bjorn Nordstrom. (<u>See, e.g.</u>, AR 332, 329.)[7]

On August 24, 2013, Plaintiff met at a veterans-affairs clinic with psychologist Jeffrey Matloff, who reviewed him for PTSD. (<u>See</u> AR 363-71.) Plaintiff reported PTSD "stemming from an attempted carjacking in 1991" and said that it was "triggered by interactions around court-related issues and legal authorities" as well as "certain media events." (AR 363.) He had trouble sleeping and felt "hyperalert." (<u>Id.</u>) He also

---

[6] Cymbalta treats depression and anxiety. <u>See</u> <u>Cymbalta</u>, WebMD, https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited June 5, 2019). It can also help relieve nerve and back pain, among other things. <u>See</u> <u>id.</u> In this case, it was apparently prescribed for depression. (<u>See, e.g.</u>, AR 306, 367.)

[7] The record lacks any indication that Plaintiff ever saw a psychiatrist for treatment. (<u>See, e.g.</u>, AR 473 (Plaintiff reporting in Nov. 2014 that his primary-care physician prescribed his mental-health-related medications).) And despite the alleged onset of disability on March 31, 2012, for reasons including PTSD, nothing in the record from that time until late 2013 relates to mental health.

10

suffered depressive episodes, "which [could] last . . . from a couple weeks to several months," and alcohol abuse. (AR 364.) "In 2008, he began treatment with [C]oncerta[,][8] which . . . effectively managed his symptoms" of attention-deficit disorder. (Id.) He had tried a number of other medications in the past, "which were not terribly effective." (AR 368.) He was going to "weekly psychotherapy . . . for the past 3 months" and "recently started marital counseling." (Id.)[9]

Dr. Matloff found that although Plaintiff had "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks," he was "generally functioning satisfactorily, with normal routine behavior, self-care and conversation." (AR 366.) His parents lived "in the same neighborhood" as him, and he "trie[d] to help them doing chores and repairs . . . on a daily basis." (AR 367.) He said he had been "a little more reclusive in the past 12 months" but enjoyed "cooking and gardening and spending time with his son and daughter." (Id.) He was in his "junior year" at the University of Phoenix, where he "maintained a 3.4 GPA." (Id.) Overall, Dr. Matloff felt that Plaintiff's "PTSD symptoms ha[d] worsened a bit since his last compensation and pension exam in 2012," but his "prognosis for improvement [was] fair to good with further

---

[8] Concerta treats attention-deficit/hyperactivity disorder. See Concerta, WebMD, https://www.webmd.com/drugs/2/drug-19857/concerta-oral/details (last visited June 5, 2019).

[9] No psychotherapy or marital-counseling records appear in the record.

treatment." (AR 371.)

On March 5, 2014, Plaintiff saw Dr. Erik Lundquist[10] for an "initial visit." (AR 303.) He reported that his ADHD was "improving," and he needed a refill of Concerta. (Id.) Dr. Lundquist observed that Plaintiff "present[ed] with anxious/ fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, difficulty staying asleep, [and] diminished interest or pleasure," among other symptoms. (Id.; see also AR 305.) He "had a fair response to exercise, . . . medication (Cymbalta) and sunlight" but was "[u]nder a lot of stress from school." (AR 303.) Dr. Lundquist prescribed a "[t]rial of Wellbutrin[11] in addition to Cymbalta as [Plaintiff] [was] not responding to maximum dose of Cymbalta." (AR 306.) He also instructed him to "[m]ake time to get some exercise." (Id.)

On April 30, 2014, Plaintiff mentioned to Dr. Nordstrom that ADHD behaviors were causing "problems at school." (AR 299.) He previously took 54 milligrams of Concerta and had been "able to wean down" to 36 milligrams when his "work load and work changed," but he was now "struggling to finish assignments, stay focused and be organized." (Id.) In response, the doctor changed his dosage back to 54 milligrams. (AR 300.)

On September 23, 2014, Plaintiff told Dr. Nordstrom that Concerta "continue[d] to work well" and that he had "improved

_____

[10] Dr. Lundquist's medical speciality is not stated in the record.

[11] Wellbutrin treats depression by helping restore the balance of neurotransmitters in the brain. See Wellbutrin, WebMD, https://www.webmd.com/drugs/2/drug-13509/wellbutrin-oral/ details (last visited June 5, 2019).

focus." (AR 295.) He apparently had been "tr[ying] to go off Wellbutrin for 3 months now" and found that his anxiety was "better" with "use of Xanax[12] occasionally." (Id. (specifying that he took ".25 mg only a few times per week")).) Occasional trazodone[13] for insomnia also "[w]ork[ed] well." (Id.) Dr. Nordstrom observed that Plaintiff was "[o]riented to time, place, person & situation" and had "[a]ppropriate mood and affect" but exhibited "[a]gitation" and anxiety. (AR 297.)

Plaintiff went to urgent care on November 3, 2014, complaining of depression. (AR 473.) The psychiatry resident who interviewed him (see AR 476) noted that he was "occasionally tearful" and said that "he had been separated from [his] wife for the last 2-3 months" and had "had crying spells for the last 2 days" (AR 473). He "mentioned school difficulties as another stressor." (Id.) He denied any suicidal ideation and was "not willing to get long term psych[iatric] care from VA at this time, as VA would not prescribe [C]oncerta as first line ADD medication." (Id.) The resident noted that Plaintiff also "declined mental health care in 2012 after intake" "due to this reason." (Id.) "He also complained" about the "limited therapy

---

[12] Xanax is a benzodiazepine that treats anxiety and panic disorders. See Xanax, WebMD, https://www.webmd.com/drugs/2/drug-9824/xanax-oral/details (last visited May 22, 2019).

[13] Trazodone treats depression. See Trazodone, WebMD, https://www.webmd.com/drugs/2/drug-11188-1340/trazodone-oral/trazodone-extended-release-oral/details (last visited May 22, 2019).

he could get from VA." (Id.)[14]  He was not seeing a
psychiatrist; his medications were prescribed by a primary-care
physician.  (AR 474.)  "After some supportive therapy," Plaintiff
felt "better" and "more future oriented to follow with tricare[15]
mental health and talk[] with friends to get over this difficult
period."  (Id.; see also AR 476 (noting that he would "benefit
from therapy for better coping skills").)  On examination, he
appeared "alert and attentive," with a "cooperative" attitude,
"linear and logical" thought patterns, "normal" speech, and
"intact" and "good" insight and judgment but "low" mood.  (AR
475.)  The resident concluded that Plaintiff did not "warrant
psychiatric inpatient admission at the moment" (AR 476) and noted
that he "was offered intake but state[d] he will just use his
tricare" (AR 477).

On November 18, 2014, Plaintiff reported to Dr. Nordstrom
that he wanted to "consider resuming his Wellbutrin" because
although "he is doing a little better recently," Wellbutrin "was
beneficial" in the past.  (AR 291.)  Dr. Nordstrom prescribed
Wellbutrin as requested and encouraged Plaintiff to "quit smoking
and alcohol" and "increase exercise and healthy diet."  (AR 293.)

At a December 2015 office visit, Plaintiff requested a
refill of Concerta and reported that he was "doing well on
current dose."  (AR 549.)  His last refill had been in July 2015.

---

[14] As noted earlier, Plaintiff did not submit any records of
therapy from a VA provider or otherwise.

[15] Tricare is the health-care program for uniformed service
members and veterans.  See About Us, Tricare, https://
www.tricare.mil/About (last visited June 5, 2019).

14

(Id.)  That same day, Plaintiff was given a PTSD screening, which was "negative."  (AR 574.)

                    b.   *Dr. Zhang's examination record and opinion*

Plaintiff met with state-agency consulting psychologist Zhang on February 11, 2016.  (See generally AR 537-43.)  He reported a "history of PTSD from his military trauma, with symptom onset around 2004."  (AR 538.)[16]  His symptoms included "depressed mood and anxiety," and he was taking Wellbutrin, Concerta, and Ambien.[17]  (Id.)  He had "no history of inpatient psychiatric treatment" but "received some mental health counseling in the past with some positive results."  (Id.)  He reported that he lived with a roommate, had a "fair" relationship with his family, was "able to take care of his basic grooming and hygiene needs," and could "drive himself" and "go out alone." (AR 539.)  He had "some difficulty" with chores because of "lack of motivation and energy" but could "prepare simple meals." (Id.)  He spent "most of his day caring for his mother, reading, and cooking."  (Id.)

Dr. Zhang observed that Plaintiff was "oriented to time, person, place, and situation."  (Id.)  He appeared "mildly depressed with constricted affect" but "denie[d] having feelings of hopelessness, helplessness and worthlessness" or any suicidal ideation.  (Id.)  He reported "feelings of sadness, irritability,

---

[16] This conflicts with Plaintiff's statements at other times that his PTSD stemmed from a 1991 attempted carjacking.  (See, e.g., AR 363.)

[17] Ambien treats insomnia.  See Ambien, WebMD, https://www.webmd.com/drugs/2/drug-9690/ambien-oral/details (last visited June 5, 2019).

15

and anger" and "having flashback and nightmares of his past trauma." (Id.) His judgment and insight were "fair." (AR 540.) Clinical testing showed that he was "functioning in the average range of intelligence" (AR 541) but that his memory capacity was "slightly below average" (AR 542). The "Trail Making" test, which "measures sustained attention, visual search, and psychomotor efficiency," showed "below average performance," but apparently primarily as to Part B, which "adds the complex requirement of shifting effectively and accurately between different paradigms." (Id. (showing "0" mistakes as to Part A and "multiple" for Part B).) Dr. Zhang deemed Plaintiff's prognosis "guarded." (Id.)

Dr. Zhang found "[n]o impairment" in Plaintiff's ability to "understand, remember, and carry out simple instructions" and "[m]ild impairment" in his ability to do the same for "detailed and complex instructions." (Id.) He also found "[m]ild impairment" in his ability "associated with daily work activity, including attendance and basic safety," and his "[a]bility to perform work activity without special or additional supervision." (Id.) He had "[m]oderate impairment" in his ability to "maintain concentration, persistence, and pace in common work settings," "interact appropriately with co-workers, supervisors, and the public," "maintain consistent attendance," "perform routine work duties," and "respond appropriately to usual work situations and to changes in a routine work setting." (AR 542-43.)

1

                 c.   *State-agency reviewing-physician opinions*

2

                      *related to mental health*

3       On March 14, 2016, reviewing psychiatrist K. Loomis[18]

4 examined Plaintiff's records, including those of consulting

5 psychologist Zhang (see AR 53-54), and determined that Plaintiff

6 had a "[s]evere" anxiety-related disorder, with "[m]ild"

7 restriction of daily activities, "[m]oderate" difficulties in

8 maintaining social functioning and concentration, persistence, or

9 pace, and no episodes of decompensation (AR 55).  Dr. Loomis

10 found that his anxiety was of neither primary nor secondary

11 "priority" but rather "[o]ther," less than certain physical

12 ailments.  (Id.)  In assessing his mental RFC, the doctor

13 determined that his "ability to remember," "understand," and

14 "carry out detailed instructions" was "[m]oderately limited" (AR

15 59), as was his "ability to interact appropriately with the

16 general public" (AR 60).  But all other functional mental

17 abilities were "[n]ot significantly limited," including his

18 "ability to ask simple questions or request assistance," "accept

19 instructions and respond appropriately to criticism from

20 supervisors," "get along with coworkers or peers," "maintain

21 regular attendance," and "maintain socially appropriate

22 behavior."  (AR 59-60.)

23      Dr. Loomis "[a]gree[d]" with Dr. Zhang's recommendation of

24 "unskilled" and "nonpublic" work, writing that Plaintiff could

25

26       [18] Dr. Loomis's electronic signature includes a medical-
specialty code of 37, indicating a psychiatry practice.  (See AR

27 54, 63); Program Operations Manual System (POMS) DI 24501.004,
U.S. Soc. Sec. Admin. (May 22, 2019), https://secure.ssa.gov/

28 apps10/poms.nsf/lnx/0424501004.

17

"maintain concentration, persistence and pace throughout a normal workday/workweek as related to simple/unskilled tasks" and was "able to interact adequately with coworkers and supervisors but may have difficulty dealing with the demands of general public contact." (AR 54.)

On reconsideration July 12, 2016, psychiatrist CW Kang[19] found that Plaintiff's anxiety disorder was of "[s]econdary priority." (AR 70.) He noted that Plaintiff was "not in formal treatment." (AR 71.) He "agree[d] with the initial assessment," concluding that Plaintiff's "mental allegations [were] partially consistent" and his "mental status" was "benign." (Id.; compare AR 59-60, with AR 74-75 (mental RFC assessment on reconsideration identical to initial assessment).)

3. <u>Analysis</u>

In assessing Plaintiff's RFC, the ALJ gave "great weight" to the state-agency reviewing psychiatrists. (AR 25.) She noted that they were "highly trained and experts in Social Security disability evaluations and had the benefit of reviewing the longitudinal treatment record from multiple providers," and "their opinions appear[ed] to be the most consistent with the totality of the evidence." (Id.) She gave "some weight, but not full weight," to consulting psychologist Zhang, finding that the state-agency reviewing physicians' opinions were "more consistent with the evidence as a whole." (AR 26.)

---

[19] Dr. Kang's electronic signature includes a medical-specialty code of 37, indicating a psychiatry practice. (See AR 71); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

Contrary to Plaintiff's assertion, the ALJ did not necessarily "reject[]" Dr. Zhang's opinion that he was moderately limited in his ability to "interact appropriately with supervisors," "maintain consistent attendance," "perform routine work duties," and "respond appropriately to work situations or changes in a routine work setting." (J. Stip. at 5.)[20] Indeed, the ALJ limited him to "unskilled work," "occasional superficial interaction with the public," and "occasional interaction with co-workers." (AR 21.) Moderate impairment does not mean total impairment, nor does it necessarily correlate to any specific work limitations. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (finding that ALJ properly translated moderate mental limitations assessed by one doctor into "concrete restrictions," such as "restriction to simple tasks"); Schultz v. Berryhill, No. 2:15-cv-00804-PAL, 2018 WL 4623109, at *13 (D. Nev. Sept. 26, 2018) (finding that ALJ properly restricted

---

[20] Plaintiff argues in his reply that the ALJ "fail[ed] to account for the limitations assessed in . . . pace" (J. Stip. at 12), but his opening argument appears to recognize that the ALJ did not reject Dr. Zhang's findings as to pace (id. at 5 (listing findings ALJ allegedly rejected but not including moderate limitation on "concentration, persistence, and pace")); indeed, the ALJ expressly found the same limitation at step three (AR 20). And Plaintiff nowhere in his issues presented asserts that the ALJ erred in determining his RFC. (See J. Stip. at 4.) Raising an argument for the first time in a reply forfeits it. See Willens v. Berryhill, 709 F. App'x 867, 868 (9th Cir. 2017); see also Anderson v. Colvin, 223 F. Supp. 3d 1108, 1131 (D. Or. 2016) (declining to consider argument not "properly" presented "because all issues must be raised in the initial brief"); Fierros v. Colvin, No. CV 13-3839-SP, 2014 WL 1682058, at *11 n.8 (C.D. Cal. Apr. 29, 2014) ("Because these arguments were not raised in the first instance in plaintiff's Memorandum, they are waived."). The Court therefore declines to consider whether the ALJ erred in her RFC analysis.

claimant with "non-exertional moderate limitations" to
"unskilled" work, among other limitations); (see also J. Stip. at
8-9 (Defendant arguing same)).[21]

Although the ALJ did not explicitly state how she discounted
portions of Dr. Zhang's opinion, the Court is entitled to draw
reasonable inferences from her decision. See Magallanes, 881
F.2d at 755; see also Warner v. Astrue, No. CV. 08-6001 ST., 2009
WL 1255466, at *9-11 (D. Or. May 4, 2009) (ALJ's rejection of one
doctor's stated limitation could be inferred from his adoption of
other doctors' less restrictive limitation).

The ALJ noted (see AR 22, 37), and Dr. Zhang acknowledged
(see AR 538), that Plaintiff had almost no specialized mental-

_____

[21] In his reply, Plaintiff cites several unpublished cases
to support his argument that the ALJ's alleged "failure to
account" for limitations Dr. Zhang assessed was harmful (see J.
Stip. at 12-13), but none are on point. In Bagby v. Comm'r Soc.
Sec., 606 F. App'x 888, 890 (9th Cir. 2015), the ALJ erred by
"fully crediting" a doctor's opinion and then not including
"credible limitations" that the doctor assessed in the
plaintiff's RFC. In Betts v. Colvin, 531 F. App'x 799, 800 & n.1
(9th Cir. 2013), the ALJ similarly erred by giving "greatest
weight" to a medical opinion and then disregarding aspects of it
without explanation. Likewise, in Olmedo v. Colvin, No. 1:14-cv-
621-SMS., 2015 WL 3448093, at *8-9 (E.D. Cal. May 28, 2015), the
ALJ gave "great weight" to two medical opinions and then
neglected to account for certain limitations they found. But
here, the ALJ gave only "some" weight to Dr. Zhang's opinion and,
as explained below, provided a specific and legitimate reason for
partially discounting it. (AR 26.)

Shea v. Astrue, NO. ED CV 12-86-E, 2012 WL 12878360, at *2-3
(C.D. Cal. Aug. 10, 2012), is also unhelpful to Plaintiff; in
that case, "no doctor opined" that the plaintiff could perform
simple tasks, and so the ALJ "had no medical basis to conclude
that the restriction to simple, repetitive tasks . . . accounted
for all the mental limitations the ALJ and the medical experts
found to exist." Here, several doctors found that Plaintiff
could perform according to his RFC. (See AR 54, 59-60.)

health treatment records.  Plaintiff's argument that Dr.
Matloff's finding as part of a VA disability determination that
he would have "occasional decrease[s] in work efficiency and
intermittent periods of inability to perform occupational tasks"
(AR 366; see also J. Stip. at 7) supported Dr. Zhang's opinion
that he was "moderate[ly]" impaired in his ability to "maintain
consistent attendance and . . . perform routine work duties" (AR
542), among other things, is not compelling.  The ALJ properly
discounted Plaintiff's disability rating from the VA (see AR 24),
which Plaintiff does not contest (see generally J. Stip.).  As
the ALJ noted, "[a] Veterans Affairs disability decision is a
decision by a governmental agency about whether an individual is
disabled based on that agency's rules," not "on Social Security
law," and so it's "not binding."  (AR 24 (emphasis in original));
see also § 404.1504.  And as Defendant argues, VA doctor
Matloff's particular finding was subject to that same analysis.
(See J. Stip. at 11).  And in any event, Dr. Matloff noted in the
same report that Plaintiff functioned "satisfactorily, with
normal routine behavior, self-care and conversation" (AR 366),
had "considerable improvement in his concentration and attention"
(id.), and was not working because of "pain," not mental
limitations (AR 367; see also J. Stip. at 11 (Defendant arguing
same)).  Moreover, no basis exists to equate Dr. Matloff's use of
the term "occasional" to mean 20 percent of the time, as
Plaintiff attempts to do (see J. Stip. at 11), because the
terminology in the two disability schemes is not the same.  See
Carinio v. Berryhill, 736 F. App'x 670, 674 (9th Cir. 2018)
(noting that "Social Security regulations use different

21

standards" from VA in determining disability).  As Defendant
points out, no doctor, including Dr. Matloff, actually opined or
even suggested that Plaintiff would be "off task 20% of the
time."  (J. Stip. at 11.)

Furthermore, Dr. Zhang's examination findings did not
support the moderate restrictions he imposed.  He acknowledged
that Plaintiff had "no history of inpatient psychiatric
treatment" and was not currently receiving mental-health
counseling.  (AR 538.)  His clinical findings showed that
Plaintiff had "below average performance" in a "timed task that
measures sustained attention, visual search, and psychomotor
efficiency," but that was apparently primarily as to the "complex
requirement of shifting effectively and accurately between
different paradigms" (AR 542); Plaintiff also had "slightly below
average" "memory capacity" (id.).  But neither finding explains
why Plaintiff would be moderately impaired interacting
"appropriately with co-workers, supervisors, and the public,"
maintaining "concentration, persistence, and pace in common work
settings," keeping "consistent attendance,"[22] responding

---

[22] Moreover, Dr. Zhang contradicted himself in assessing
Plaintiff's ability to maintain attendance.  He found both that
Plaintiff would be only mildly impaired in maintaining
"attendance" associated with "daily work activity" but also
moderately impaired in "maintain[ing] consistent attendance."
(AR 542.)  He nowhere explained the inconsistency.  See Jessaca
L. v. Comm'r Soc. Sec., No. 3:18-cv-05408-TLF, 2019 WL 2004763,
at *4 (W.D. Wash. May 7, 2019) ("An ALJ may discount an examining
doctor's opinion based on its inconsistencies with the doctor's
own notes.").

In his reply, Plaintiff argues that failure to attend the
(continued...)

22

"appropriately to usual work situations and to changes in a routine work setting," or performing "routine work duties" (AR 542-43). Dr. Zhang's objective findings were "essentially benign," as noted by the ALJ. (AR 26; <u>see also</u> AR 539-43.)

Inconsistency with the medical evidence, including a doctor's own notes, is a specific and legitimate reason to discount a physician's opinion. <u>See</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008); <u>Jessaca L. v. Comm'r Soc. Sec.</u>, No. 3:18-cv-05408-TLF, 2019 WL 2004763, at *4 (W.D. Wash. May 7, 2019) ("An ALJ may discount an examining doctor's opinion based on its inconsistencies with the doctor's own notes."); <u>see also</u> <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected physician's opinion when it was "implausible" and "not supported by any findings by any doctor," including herself).

Unlike Dr. Zhang, the state-agency reviewing psychiatrists found that Plaintiff's limitations were mostly not significant (<u>see</u> AR 59-60, 74-75), and the ALJ assigned their opinions "great weight" (AR 25), a finding Plaintiff has not challenged. Because Dr. Zhang's opinion was contradicted by other medical-opinion evidence, the ALJ needed to provide only a "specific and

---

[22] (...continued)
hearing and his "academic probation" are evidence of his "trouble with attendance." (J. Stip. at 13 n.2.) But as the ALJ pointed out, he provided no actual evidence concerning his academic status (AR 22), just attorney argument, and what evidence there was in the record about his nonappearance at the hearing was contradictory (<u>compare</u> AR 16-17 & 149, <u>with</u> AR 39). Moreover, it seems reasonable to infer that any attendance issues Plaintiff may have had arose at least in part from his alcohol abuse. <u>See</u> <u>infra</u> note 36.

legitimate reason" for discounting it, <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31), and she did so. <u>See Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004) (lack of "supportive objective evidence" and "contradict[ion] by other statements and assessments of [plaintiff's] medical condition" were "specific and legitimate reasons" to discount physicians' opinions; <u>see also</u> <u>Saelee</u>, 94 F.3d at 522 ("findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings").

For all the foregoing reasons, the ALJ did not err in giving Dr. Zhang's opinion only "some weight" (AR 26), and remand is not warranted on this basis.

B. <u>The ALJ Properly Evaluated Plaintiff's Subjective Symptom Testimony</u>

Plaintiff claims that the ALJ erred by failing to "provide clear and convincing reasons to reject [his] subjective limitations." (J. Stip. at 14; <u>see also generally</u> <u>id.</u> at 14-17, 22-23.) But as set forth below, the ALJ provided ample support for her finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (AR 23.) Thus, remand is not warranted on this ground.

1. <u>Applicable law</u>

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended)

24

(citation omitted); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir.

1985) (as amended Feb. 24, 1986). "[T]he ALJ is not required to

believe every allegation of disabling pain, or else disability

benefits would be available for the asking, a result plainly

contrary to 42 U.S.C. § 423(d)(5)(A)." <u>Molina v. Astrue</u>, 674

F.3d 1104, 1112 (9th Cir. 2012) (citing <u>Fair v. Bowen</u>, 885 F.2d

597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the

ALJ engages in a two-step analysis. <u>See</u> <u>Lingenfelter</u>, 504 F.3d

at 1035-36; <u>see also</u> SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16,

2016).[23] "First, the ALJ must determine whether the claimant has

presented objective medical evidence of an underlying impairment

[that] could reasonably be expected to produce the pain or other

symptoms alleged." <u>Lingenfelter</u>, 504 F.3d at 1036 (citation

omitted). If such objective medical evidence exists, the ALJ may

---

[23] The Commissioner applies SSR 16-3p to all
"determinations and decisions on or after March 28, 2016." Soc.
Sec. Admin., Policy Interpretation Ruling, SSR 16-3p n.27,
https://www.ssa.gov/OPHome/rulings/di/01/SSR2016-03-di-01.html
(last visited May 22, 2019). Thus, it applies here. Though the
new ruling eliminates the term "credibility" and focuses on
"consistency" instead, Plaintiff refers to credibility (<u>see</u> J.
Stip. at 15-16), and much of the relevant case law uses that
language too. But as the Ninth Circuit has clarified, SSR 16-3p

> makes clear what our precedent already required: that
> assessments of an individual's testimony by an ALJ are
> designed to "evaluate the intensity and persistence of
> symptoms after [the ALJ] find[s] that the individual has
> a medically determinable impairment(s) that could
> reasonably be expected to produce those symptoms," and
> not to delve into wide-ranging scrutiny of the claimant's
> character and apparent truthfulness.

<u>Trevizo v. Berryhill</u>, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as
amended) (alterations in original) (quoting SSR 16-3p).

not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged." <u>Smolen</u>, 80 F.3d at 1282 (emphasis in original), <u>superseded in part by statute on other grounds</u>, § 404.1529.

If the claimant meets the first test, the ALJ may discount the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing <u>Lingenfelter</u>, 504 F.3d at 1036); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at 959.

Contradiction with evidence in the medical record is a

26

"sufficient basis" for rejecting a claimant's subjective symptom testimony. Carmickle, 533 F.3d at 1161; see also Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining statements).  But it "cannot form the sole basis for discounting pain testimony."  Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005); Rollins, 261 F.3d at 857 (citing then-current version of § 404.1529(c)(2)).

### 2. Relevant background

#### a. *Plaintiff's statements*

In a November 16, 2015 function report, Plaintiff wrote that he had "[l]imited mobility" and couldn't "stand or walk for extended periods" or "lift heavy items."  (AR 200.)  He also couldn't "be around large groups of people," had "[p]roblems concentrating or remembering things," needed "access to [a] restroom 15-20 times a day," and couldn't "drive for extended distances."  (Id.)  On an average day, he would "[s]hower," "[s]tudy," and do "[l]imited housework," including cooking and cleaning.  (AR 201.)  He helped his son with "[d]aily activities" and took care of "cats."  (Id.)  His wife apparently helped "at times."  (Id.)  He had to "wear slip on shoes due to back pain." (Id.)  He needed reminders to take his medication (AR 202) and couldn't "cook from scratch" because of problems standing "for extended periods" (AR 201, 202).  He spent "10-15 minutes" preparing food "daily," made his bed, cleaned the "bathroom and kitchen," and did "[l]aundry sometimes."  (AR 202.)  He went out

27

alone "sometimes" and shopped for "[f]ood, [c]lothes, [and]
[h]ousehold items" once a week for "up to 30 minutes." (AR 203.)
He had a "90% reduction" in his athletic hobbies "due to pain,
range of motion and anxiety." (AR 204.) He spent time "at home
with visitors" and "[ate] out with friends" once every "1-2
weeks." (Id.) He went to restaurants and barbeques "on a
regular basis" (id.) but did not "go out in public as much" since
going through a divorce (AR 205).

Plaintiff wrote that his impairments affected "lifting,"
"squatting," "bending," "standing," "reaching," "walking,"
"sitting," "kneeling," "stair-climbing," "memory," "completing
tasks," "concentration," "using hands," and "getting along with
others." (Id.) He could not "lift more than 30lbs or bend" or
"stand/walk for extended periods." (Id.) He was "[e]asily
irritated." (Id.) His attention span and ability to follow
written instructions "varie[d]." (Id.) He got along with
authority figures "well at times" but did not handle stress well
"any longer" and needed to "[t]ry not to deviate from established
routine." (AR 206.) He suffered "[e]xtreme anxiety and feeling
[sic] of hopelessness" as well as "[f]ear of wife leaving."
(Id.)

In his May 18, 2016 request for reconsideration, Plaintiff
wrote that he had "very limited movement of neck and extreme pain
in neck from previous fracture" and "[l]imited use of right hand
and increased pain from nerve damage." (AR 221; see also AR 227
(reporting that he had "limited ability to conduct basic daily
activities due to neck and spine pain and limited use of right
hand").) He had had "xrays" and was "waiting" for an MRI for his

"[n]eck and right wrist/hand pain." (AR 222.) His "[d]ecreased capabilit[ies] in day to day functions due to extreme depression ha[d] resulted in divorce." (AR 221; but see AR 227 (writing that divorce was "due to emotional state").) He was taking Wellbutrin for depression, Concerta for ADD, and Xanax for anxiety, all prescribed by Dr. Nordstrom. (AR 225.) He was "[n]o longer" able to "go out" or "go to school." (AR 226.)

Plaintiff did not show up for his April 2017 hearing and thus did not testify. (See generally AR 35-39 (discussing failure to attend).) The ALJ left the record open (AR 47-48) for "over five months" (AR 17) so that he could submit "additional statements . . . regarding his impairments," among other documents, but "no additional evidence [was] received" (id.).

b. *Records related to physical impairments*

On December 5, 2013, Plaintiff complained to a nurse in Dr. Nordstrom's office of "back pain and constant chest pain" and "joint pain [i]n feet, ankle and knees." (AR 328.) He claimed that "he was informed it was degenerative bone disease from Navy doctor 13 years ago." (Id.) He told Dr. Nordstrom that he had "[s]een a chiropractor which helped some" but was not exercising "due to the increased pain." (Id.) The doctor noted that a "[r]ecent back MRI showed mild stenosis only." (Id.) His "right lower lumbar paraspinal muscle" was "tender[] to palpation." (AR 330.) Dr. Nordstrom recommended exercise and wrote that he would "place a referral for physical therapy." (AR 330-31.)

VA doctor Robert Gaumer[24] examined Plaintiff for back and foot conditions on August 29, 2013 (see generally AR 346-57, 362), and found that he had limited forward flexion (see AR 349) but otherwise normal range of motion (see AR 340-50) in his thoracolumbar spine. He had "localized tenderness or pain to palpation" but no "guarding or muscle spasm." (AR 352.) His muscle strength in his hips, knees, ankles, and toes was "4/5" or "5/5" (AR 352-53), and his knee and ankle reflexes were normal (AR 353). He had a positive straight-leg-raise test[25] on the right side and mild to moderate signs of radiculopathy in his right leg. (AR 354.) He did not need an assistive device to ambulate. (AR 355, 361.) The provider concluded that Plaintiff had "[m]inimal osteophytosis and disk space narrowing at L5-S1" (AR 357) but no functional impairments (AR 355). His back condition had no "impact on his . . . ability to work (AR 356), nor did his foot condition (see AR 362).

In August 2014, Plaintiff saw chiropractor Lee Hazen for lower-back pain. (AR 524.) Dr. Hazen performed manipulation, which Plaintiff "tolerated . . . well." (Id.) He went to Dr. Hazen again in March 2015, complaining of "persistent lower back pain and bilateral buttocks pain." (AR 525.) He was apparently not visiting the office regularly "primarily due to lack of

_____

[24] Dr. Gaumer's medical speciality is not stated in the record.

[25] A straight-leg-raise test checks the mechanical movement of neurological tissues and their sensitivity to stress and compression when disc herniation is suspected. See Straight Leg Raise Test, Physiopedia, https://www.physio-pedia.com/ Straight_Leg_Raise_Test (last visited June 7, 2019).

insurance coverage and financial means." (Id.)  He was doing his

exercises "in[]frequently."  (Id.)  His "deep tendon reflex[es]"

were "within normal limits," muscle strength was "intact," and

his range of motion was "within normal limits."  (Id.)  But he

had "[p]ain on palpation and somatic dysfunction . . . at the L3

through S1 vertebral level," and "Kemps sign[26] [was] positive."

(Id.)  Dr. Hazen recommended that he "exercise more frequently."

(Id.)  Records dated April and August 2015 contain largely the

same findings.  (See AR 526, 527, 528.)  On September 3, 2015,

Plaintiff apparently reported that his pain was "better today

than the last visit."  (AR 530.)  The doctor's notes and

recommendations remained the same.  (See id.)

On January 27, 2016, Plaintiff saw consulting orthopedic

surgeon Vicente Bernabe.  (See AR 531-36.)  He complained of

"multiple joint and extremity pain" and reported that he had

"received physical therapy and chiropractic treatment for his

back pain and neck pain, but no surgical intervention."  (AR

532.)  He was "no longer receiving any physical therapy or

chiropractic treatment" and took medications for the pain.  (Id.)

Dr. Bernabe observed that Plaintiff "moved freely . . . without

the use of any assistive device" and had "normal" gait.  (AR

533.)  His neck range of motion was normal, and "inspection of

the thoracic spine was unrevealing."  (Id.)  His back range of

motion was somewhat limited (see id.), and "there [was]

tenderness to palpation at the lower lumbar region" (AR 534).

---

[26] The Kemp test assesses the lumbar-spine facet joints to
detect pain.  See Kemp test, Physiopedia, https://
www.physio-pedia.com/KEMP_test (last visited June 7, 2019).

31

The straight-leg-raise test was negative bilaterally.  (Id.)  Dr.
Bernabe noted that Plaintiff had "well healed arthroscopic
surgical scars on both shoulders" (AR 534; see also AR 532
(noting surgeries from before relevant period)) and that his
range of motion was normal bilaterally (AR 534).  His elbows,
wrists, hands, hips, knees, ankles, and feet were all "normal."
(See id.)  Dr. Bernabe diagnosed lumbar strain and determined
that Plaintiff could "lift and carry no more than 50 pounds
occasionally and 25 pounds frequently," "push and pull without
restrictions," "walk and stand six hours out of an eight-hour day
with normal breaks," "bend[], kneel[], stoop[], crawl[], and
crouch[] . . . without limitation," "walk on uneven terrain,
climb ladders, and work at heights without restrictions," "sit
without restrictions," and perform manipulation without
restrictions.  (AR 535-36.)

In February 2016, the state-agency reviewing doctor at the
initial level, V. Michelotti,[27] found a primary diagnosis of
severe discogenic and degenerative back disorder and a secondary
diagnosis of severe joint dysfunction.  (AR 54, 55.)  The doctor
noted that "[r]ecords d[id] not cover the span of [Plaintiff's]
allegations" and that the consulting orthopedist's medical-source
statement was "consistent with a medium RFC, which is a snapshot
underestimate of limitations."  (AR 54.)  Dr. Michelotti
ultimately assessed a light RFC with postural limitations (see AR

_____

[27] Dr. Michelotti's electronic signature includes a medical-
specialty code of 32, indicating a pediatrics practice.  (See AR
54, 63); Program Operations Manual System (POMS) DI 24501.004,
U.S. Soc. Sec. Admin. (May 22, 2019), https://secure.ssa.gov/
apps10/poms.nsf/lnx/0424501004.

57) but commented that "[t]here [was] no evidence of a consecutive 12 month period during which [Plaintiff] would have required a more restrictive [than medium] RFC" (AR 54). On reconsideration, the state-agency reviewing doctor wrote that "light RFC seems appropriate[;] adopt light RFC." (AR 69; see also AR 73.)

An MRI of Plaintiff's cervical spine in May 2016 showed that he had "no acute fracture or sublaxation" and that "vertebral body heights," "disc heights and signal" were preserved. (AR 553.) The neuroradiologist found "[m]ultilevel facet hypertrophy with mild left neural foraminal stenosis at C2-3 and mild bilateral neural foraminal stenosis at C6-7 and C7-T1." (AR 554.) An x-ray of the cervical spine showed that alignment was "within normal limits" and "[a]ll vertebral bodies and intervertebral disc spaces [were] maintained." (AR 555.) Plaintiff's paravertebral soft tissues were also "within normal limits." (Id.) An x-ray of his right wrist showed "[n]o acute fracture or dislocation." (AR 556.)

### c. Records related to Crohn's disease[28]

An October 4, 2012 gastrointestinal biopsy "indicated the presence of chronic inflammation," which could be "due to infections or conditions such as inflammatory bowel disease (Crohn's/ulcerative colitis)." (AR 277; see also AR 472-73 (Dr.

---

[28] Arguably, Plaintiff has forfeited any argument concerning his alleged Crohn's disease, raising it only in a footnote and then again in his reply. (See J. Stip. at 15 n.4, 23); Estate of Saunders v. C.I.R., 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived."). Because it lacks merit in any event, the Court nonetheless considers it.

33

Gaumer recounting inconclusive history in 2015).)

At a January 2015 "general medical examination for administrative purposes" at a VA clinic (AR 339), Plaintiff reported that he was diagnosed with Crohn's disease in December 2012 but was "not [seeking care] for this condition." (AR 341.) He complained of abdominal pain and said that he could "have diarrhea 10-15 [times] daily" and "bloody stools . . . every 6-8 weeks" for "1-4 days." (Id.) Yet he "[d]enie[d] medications for Crohn's," reporting that he did "[d]iet modifications and supplements" instead. (Id.) "[C]ontinuous medication" was not "required for control" of his condition, and no "surgical treatment" had been rendered. (AR 343.) The provider flagged that Plaintiff apparently had not actually been diagnosed with Crohn's disease, noting that the "most recent VA gastroenterology report in 12/2012 indicates: 'The etiology for [Plaintiff]'s abdominal pain, intermittent diarrhea and colonoscopy findings is not entirely clear.'" (AR 345.) The report concluded that Crohn's disease was "possible as is an infectious process." (Id.)

At a March 2015 appointment with Dr. Nordstrom, Plaintiff complained of "nausea and diarrhea for the past week." (AR 279.) Dr. Nordstrom wrote that he had a "history of Crohn's" but "was better with healthy diet." (Id.) He observed "[t]enderness to palpation in the left upper quadrant with palpable mass, possibly muscle spasm." (AR 281.) His impression was that the pain was "possibly musculoskeletal versus intra-abdominal." (Id.) He recommended "urgent CT" and noted that the pain was "[p]ossibly related to Crohn's[] flare" and that a "GI colonoscopy" might be

34

needed in the future.  (AR 282.)

On April 9, 2015, Plaintiff "denie[d] a GI consult" (AR 466), and on May 14, 2015, he had a colonoscopy that yielded mostly "normal" results and a "patchy area of mildly erythematous mucosa"[29] in part of the colon.  (AR 455.)  Biopsies during the colonoscopy revealed "no significant histopathology," and the rectum biopsy showed only "surface hyperplastic changes."  (AR 481.)[30]  The "staff physician," whose speciality was not stated in the record, recommended he take Immodium or Pepto-Bismol for diarrhea.  (AR 455; see also AR 456.)

In August 2015, Plaintiff went to the emergency room for abdominal pain (AR 484); a CT scan showed "unremarkable" results apart from his appendix, which was "mildly prominent with mild surrounding inflammation" (AR 488).  The reviewing doctor determined that "appendicitis" was "possible."  (Id.; see also AR 507 (stating that Plaintiff had "what appears to be early acute appendicitis").)  After discussing the "medically viable alternative" of "treating his appendicitis with antibiotics," Plaintiff opted to "proceed with laparascopic appendectomy."  (AR 507; see also AR 511-12 (surgery notes).)  Although Plaintiff initially reported a "previous history of colitis" (AR 484), no

---

[29] Erythematous mucosa means that the inner lining of the digestive tract is red.  See What is Erythematous Mucosa and How Is it Treated?, healthline, https://www.healthline.com/health/erythematous-mucosa (last visited June 5, 2019).

[30] The record does not include any follow-up treatment or discussion based on these results, nor was a diagnosis of Crohn's disease confirmed.  (See AR 480 (noting that purpose of biopsies was to "rule out Crohn's").)

doctor connected the appendicitis with colitis (see generally AR 484-512).

On December 22, 2015, Plaintiff told a nurse that he had "stomach pain rated as a 1" on a scale of zero to 10. (AR 575.) Over a year later, on January 18, 2017, he reported "abdominal discomfort after eating meals" and told Dr. Nordstrom that he was looking into possible food allergies. (AR 580; see also AR 584 (at Jan. 4, 2017 office visit for unrelated issues, Plaintiff "wonder[ed] if he ha[d] food allergies" because his stomach cramping was "much improved with cutting out eggs and some dairy").) Dr. Nordstrom remarked that although Plaintiff was apparently "[t]old that he ha[d] Crohn's disease," he had "never had any treatment." (AR 580.) He diagnosed "[g]astroesophageal reflux disease without esophagitis" and prescribed "omeprazole"[31] and "Tums for breakthrough discomfort." (AR 582.) He also suggested that Plaintiff get another endoscopy and consult with a GI specialist for his "Crohn's history." (Id.)

On March 1, 2017, Plaintiff met with gastroenterologist and internist Gregory Ardigo, reporting "[d]igestive problems for years" and colon polyps in 2011. (AR 615.) He claimed that he was "told" he had Crohn's but was "never given treatment." (Id.) His symptoms were "[p]ain after eating" and "[b]loating discomfort"; he had "[n]o blood in stool," "black stool," or "weight loss." (Id.) He "[d]enie[d]" any "change in his bowel

---

[31] Omeprazole treats stomach and esophagus problems like acid reflux. See Omeprazole Capsule, Delayed Release (Enteric Coated), WebMD, https://www.webmd.com/drugs/2/drug-3766-143/omeprazole-oral/omeprazole-delayed-release-capsule-oral/details (last visited June 5, 2019).

habits, constipation, diarrhea," or any other issues apart from
"abdominal pain [and] indigestion." (Id.) Dr. Ardigo's
impression was that he had "GERD/[g]astroesophageal [r]eflux" and
a "[p]ers[istent] h[istory] of [c]olon [p]olyps." (AR 616.) He
did not confirm a diagnosis of Crohn's disease. (See generally
id.) He indicated that he would conduct a colonoscopy and
esophagogastroduodenoscopy with anesthesia. (Id.; see also AR
618.) Neither procedure is reflected in the record, however.

### d. *The ALJ's findings*

The ALJ found that Plaintiff had "not generally received the
type of medical treatment one would expect for a totally disabled
individual" and that his "allegations concerning the intensity,
persistence and limiting effects of his symptoms [we]re less than
fully persuasive." (AR 22; see also AR 23 (referring to
Plaintiff's "persuasiveness" as "highly suspect based on the
discrepancy between [his] subjective complaints and the objective
medical evidence").) Because his allegations were "inconsistent
with the objective medical evidence," she deduced that he had
attempted to "exaggerate the severity of his symptoms." (AR 22.)
For example, despite reporting a "history of mental health
problems" he "was not currently receiving mental health
treatment." (Id.) Such inconsistencies "diminishe[d] the
persuasiveness" of his allegations of PTSD and depression. (Id.)

Furthermore, as the ALJ noted, his treating doctors never
recommended any functional restrictions or indicated that his
impairments would impact his ability to work. (Id.) To the
contrary, for example, although the ALJ found Plaintiff to have
"severe" "degenerative disc disease of the lumbar spine" (AR 19),

one of his treating doctors expressly noted that his back
condition was not serious enough to affect his ability to work.
(AR 22 (citing AR 356).)  She flagged that the recent VA records
did not "document a disabling musculoskeletal impairment" either.
(AR 24.)  And while not a treating doctor, the consulting
orthopedist found in January 2016 that Plaintiff could "push and
pull without restrictions, lift and carry 50 pounds occasionally
and 25 pounds frequently," walk and stand "for 6 hours out of an
8-hour workday with normal breaks," sit "without restrictions,"
do all postural activities "without limitation," and perform any
activities requiring agility, "such as walking on uneven terrain,
climbing ladders, or working at heights . . . without
limitation."  (AR 25; see also AR 24.)

        The ALJ also recounted Plaintiff's history of conservative
treatment, stating that the "lack of more aggressive treatment"
suggested his "symptoms and limitations were not as severe" as
alleged.  (AR 22.)  And she noted that the limited treatment and
medications he received "ha[d] been generally successful in
controlling those symptoms," specifically pointing out that he
reported being better with Wellbutrin and occasional use of
Xanax.  (Id.)  A review of the "complete medical history" showed
that he received "routine and very conservative treatment" (AR
23), and his chiropractor encouraged him simply to "exercise more
frequently" (AR 24; see also AR 293, 331 (Dr. Nordstrom
recommending same)).

        At step three, the ALJ found that Plaintiff had "moderate
limitation[s]" in "understanding, remembering, or applying
information," "interacting with others," "concentrating,

persisting or maintaining pace," and "adapting or managing"
himself. (AR 20.) But she noted that he was "able to perform
simple mathematical calculations" and "serial sevens" and that
his "fund of general knowledge was intact." (Id.) Further, he
was "able to take care of his basic grooming and hygiene,"
"drive," "go out alone," "pay bills and handle money
appropriately and responsibly," "prepare meals," "read," and
"cook." (Id.) At step four, she considered his 2015 function
report, in which he wrote that he "help[ed] take care of his son
and cats," "prepare[d] his own simple meals," did "household
chores," went "out several times a week," could drive "short
distances," went out "alone," shopped "in stores," and socialized
"with others." (AR 21-22.) She also recounted his reported
limitations, including his difficulty being "around large groups
of people," concentrating "and remembering things," and "handling
stress." (AR 22.) The ALJ noted, however, that he was
apparently a "full-time student attending classes five days a
week on campus." (Id.) Although his attorney had indicated that
he was on academic probation, he "did not submit any school
records or evidence or his transcript showing any problems or
success regarding his schooling" (id.) even though the ALJ left
the record open for "over five months" and had asked the attorney
to do so (AR 17, 39).

### 3. Analysis

Plaintiff argues that the ALJ failed to provide a clear and
convincing reason to reject his subjective symptom statements.
(See J. Stip. at 14.) In fact, she provided four: activities of
daily living, conservative treatment, effective control of

39

symptoms with medication, and inconsistency with the objective medical evidence. (See generally AR 22-24.)

### a. *Activities of daily living*

First, the ALJ recounted some of Plaintiff's activities of daily living, including taking care of his son and cats, preparing meals, doing chores, going shopping in stores, going out alone, and socializing. (AR 22.) She also noted that he attended college classes five days a week on campus.[32] (Id.) Plaintiff is correct that the ALJ did not explicitly state that "these activities discredited [him]" (J. Stip. at 16), but she discussed them in the context of evaluating his "persuasiveness" (see generally AR 21-22), which was sufficient. See Magallanes, 881 F.2d at 755. An ALJ may discount a claimant's subjective symptom testimony when it is inconsistent with his daily activities. See Molina, 674 F.3d at 1113. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. Doing chores and going to school are activities that can undermine a plaintiff's subjective symptom statements. See Matthews v. Shalala, 10 F.3d 678, 679-80 (9th

---

[32] Plaintiff asserts that Defendant's noting that he had a 3.4 GPA in 2015 is an impermissible "post hoc rationalization." (J. Stip. at 22.) But the ALJ expressly cited Plaintiff's ability to stay enrolled in school as a full-time student as being inconsistent with his statements about the severity of his alleged symptoms. (AR 22.) There is nothing improper in Defendant's pointing to a detail concerning Plaintiff's schooling given that the ALJ expressly relied on that reason to discount his statements.

Cir. 1993) (upholding ALJ's finding that claimant's pain testimony was undermined by his ability to do chores, go shopping, and attend school three days a week, "an activity which is inconsistent with an alleged inability to perform all work").

### b.   *Conservative treatment*

Second, conservative treatment is a clear and convincing reason for an ALJ to discount a plaintiff's testimony regarding the severity of an impairment. <u>Parra</u>, 481 F.3d at 751; (<u>see also</u> AR 37 (ALJ commenting at hearing that she "did not see any records in connection with the claimant's mental health" and attorney agreeing that "there's very little"), 39 (ALJ noting that "musculoskeletal [records] including diagnostic tests . . . would be helpful")).

Plaintiff's argument that the ALJ "did not state what type of care [he] should have received" (J. Stip. at 16) is unfounded; the ALJ stated that she would expect someone "with the alleged severity of his PTSD or depression and functional limitations" to receive specialized mental-health treatment (AR 22).  Indeed, Plaintiff never saw a psychiatrist (<u>see</u> AR 71, 474), and although he had allegedly seen a therapist at some point, the record is devoid of any such evidence.

General practitioners and primary-care physicians often treat mental illnesses, however.  <u>See</u> <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1232 (9th Cir. 1987) ("[I]t is well established that primary care physicians (those in family or general practice) 'identify and treat the majority of Americans' psychiatric disorders.'" (citation omitted)).  Such treatment "by itself" may not be a "clear and convincing reason" to discount a plaintiff's

41

subjective symptom statements about mental health, <u>Rosas v.</u>
<u>Colvin</u>, No. CV 13-2756-SP., 2014 WL 3736531, at *11 (C.D. Cal.
July 28, 2014); <u>but see</u> <u>Rosalia v. Colvin</u>, No. 2:15-cv-0184-CKD,
2016 WL 29597, at *7 (E.D. Cal. Jan. 4, 2016) (citing ALJ's
finding that "claimant [was] conservatively treated at primary
care rather than counseling or therapy" as "clear and convincing
reason[] for discounting plaintiff's testimony").  But even if
the ALJ erred by discounting Plaintiff's subjective symptom
statements because of his lack of specialized mental-health
treatment (<u>see</u> AR 24), she properly found that he was "better"
with medication (<u>id.</u>), which is a conservative treatment
modality, as discussed below.  <u>Cf.</u> <u>Rosas</u>, 2014 WL 3736531, at *11
(noting that claimant received medication from primary-care
doctor but not whether such medication was helpful).[33]

   Furthermore, unlike the plaintiff in <u>Nguyen v. Chater</u>, 100
F.3d 1462, 1464-65 (9th Cir. 1996) (claimant's failure to seek
any psychiatric treatment for over three years not legitimate
basis for discounting medical opinion that he had severe
depressive disorder), Plaintiff here did not appear to have any
problem reporting or seeking care for his mental-health issues.
He even went to a VA psychiatric urgent-care department for
"depress[ion]" in 2014.  (AR 473.)  The psychiatric resident who

_____

   [33] In any event, the ALJ properly found at least two reasons
in addition to conservative treatment to discount Plaintiff's
subjective symptom statements, thus rendering any error in citing
his lack of specialized care harmless.  <u>See</u> <u>Larkins v. Colvin</u>,
674 F. App'x 632, 633 (9th Cir. 2017) ("[B]ecause the ALJ gave
specific, clear and convincing reasons for finding [plaintiff]
not fully credible, any error in the additional reasons the ALJ
provided for finding [her] not fully credible was harmless.").

42

met with him "[p]rovided lengthy supportive therapy" but
determined that he did "not meet criteria for 5150 hold" or
"psychiatric inpatient admission" (AR 476) and discharged him
after a few hours (compare AR 473 (timestamp indicating admission
at 3 p.m.), with 476 (timestamp indicating discharge at 6:59
p.m.)).  Plaintiff refused intake for specialized mental-health
treatment with the VA because the VA wouldn't give him his
preferred ADD medication (see AR 473 (noting that he refused
intake in 2012 for same reason);[34] see also AR 477 (stating that
Plaintiff "will just use his tricare")).  He was never
hospitalized for psychiatric care.  (See 477, 538.)[35] Cf. Judge
v. Astrue, No. CV 09-4743-PJW., 2010 WL 3245813, at *4 (C.D. Cal.
Aug. 16, 2010) ("[The claimant's] failure to get treatment . . .
seems more a function of the fact that she did not need it, as
opposed to her inability to comprehend that she needed it.").

As for Plaintiff's physical impairments, the ALJ noted that
he reported a "history of treatment including physical therapy,
chiropractic treatment but no surgical intervention."  (AR 24.)
Such treatment is properly categorized as conservative.  See
Morris v. Colvin, No. CV 13-6236-OP., 2014 WL 2547599, at *4
(C.D. Cal. June 3, 2014) (finding that physical therapy, use of
TENS unit, chiropractic treatment, and medications including

---

[34] He apparently "also complained [of the] limited therapy
he could get from VA" (AR 473), but as noted earlier, Plaintiff
provided no evidence that he sought or received therapy at all.

[35]  Plaintiff asserts that he was "psychiatrically
hospitalized in November 2014." (J. Stip. at 22.)  But the AR
page he cites for that proposition makes no mention of any such
incident.  (See id. (citing AR 370).)

Vicodin was conservative); see also Tommasetti, 533 F.3d at 1039-
40 (stating that "favorabl[e]" "response to conservative
treatment undermines [claimant's] reports regarding disabling
nature of his pain"). And as the ALJ flagged at the hearing, no
physical-therapy treatment notes are even in the record. (See AR
39.)

c. *Control of psychiatric symptoms with
medication*

Third, as noted by the ALJ, psychiatric "medications ha[d]
been generally successful in controlling [Plaintiff's] symptoms."
(AR 22; see also, e.g., AR 291 (stating that Wellbutrin "was
beneficial"), 295 (stating that Concerta "continue[d] to work
well," trazodone "work[ed] well," and occasional low doses of
Xanax were "better" for his anxiety than daily medication), 303
(noting that Plaintiff had "fair response" to Cymbalta and
sunlight).) "Impairments that can be controlled effectively with
medication are not disabling for the purpose of determining
eligibility for SSI benefits." Warre v. Comm'r of Soc. Sec.
Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); see also Rosalia,
2016 WL 29597, at *8 (finding that plaintiff's "relative
stability" with "medication for her mental impairments"
"undermined her credibility with regard to her allegations that
her impairments rendered her totally disabled").

d. *Inconsistency with objective medical evidence*

Fourth, as the ALJ explained, Plaintiff's allegations were
generally inconsistent with the objective medical evidence. (See
AR 22, 23, 26.) Plaintiff's argument that the VA doctors "rated
him 100% disabled" and implicitly put "restrictions" on him (J.

44

Stip. at 17) is not compelling.  As explained earlier, the ALJ
properly discounted the VA records[36] and noted that none of the
"recent records document[ed] a disabling musculoskeletal
impairment" (AR 24).  In his request for reconsideration,
Plaintiff noted that he had "limited ability to conduct basic
daily activities due to neck and spine pain and limited use of
right hand" (AR 227), but the contemporaneous x-rays and MRI
revealed almost entirely normal results (see AR 553-56).  And
treatment notes from his physicians confirmed that medication was
effective in controlling his symptoms (see, e.g., AR 291, 295)
and that he was "generally functioning satisfactorily, with
normal routine behavior, self-care and conversation" (AR 366).
Because treatment notes and test results contradict Plaintiff's
subjective pain testimony, they're a "sufficient basis" for
rejecting it.  Carmickle, 533 F.3d at 1161; see also Morgan, 169
F.3d at 600 (upholding "conflict between [plaintiff's] testimony
of subjective complaints and the objective medical evidence in
the record" as "specific and substantial" reason undermining
credibility).

      Furthermore, the ALJ gave "great weight" (AR 25) to the

_____

      [36] Moreover, the 100 percent disability rating by the VA was
based 70 percent on PTSD "with alcohol abuse."  (AR 153.)  The
ALJ also found that "alcohol abuse" was a severe impairment (AR
19), a finding neither party has challenged.  Even if the ALJ had
erred in finding Plaintiff not disabled, he would still not be
entitled to benefits: he would first have to show that alcoholism
was not a contributing factor material to any disability
determination.  See 42 U.S.C. § 423(d)(2)(C); see also 20 C.F.R.
§ 404.1535(b)(1) ("The key factor we will examine in determining
whether drug addiction or alcoholism is a contributing factor
material to the determination of disability is whether we would
still find you disabled if you stopped using drugs or alcohol.").

state-agency reviewing doctors, who assessed light RFCs (see, e.g., AR 57) and noted that "[t]here [was] no evidence of a consecutive 12 month period during which [Plaintiff] would have required a more restrictive [than medium] RFC" (AR 54), a determination that Plaintiff does not challenge (see generally J. Stip.). And although Plaintiff claims that the ALJ failed to explain how he could work with his "insomnia," "limited mobility," and inability "to stand or walk for long periods" (J. Stip. at 15), the ALJ recounted his many benign diagnostic tests (see, e.g., AR at 23-24 (citing chiropractic-examination results), 24-25 (listing findings from examining orthopedist)) and properly took notice that treating doctors and the examining orthopedist found that Plaintiff's physical impairments would not preclude working (see AR 22, 24, 25).

Although Plaintiff is correct that the ALJ neglected to mention his allegation of Crohn's disease (see J. Stip. at 15 n.4 & 23), he does not challenge the ALJ's decision to not include Crohn's as a "severe" impairment at step two, and many doctors noted that any diagnosis of Crohn's disease was not documented (see, e.g., AR 345, 451) and that he had never received treatment for it (see, e.g., AR 279, 341, 343, 580, 615). For these reasons, the ALJ was justified in not discussing it, cf. Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("[T]he ALJ does not need to 'discuss every piece of evidence.'" (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998))), and any error was harmless.

The four reasons the ALJ gave for discounting Plaintiff's subjective symptom statements were girded by her implicit finding

46

that Plaintiff was dishonest when he attempted to explain his nonappearance at the hearing. (See AR 16-17.) By finding no "good cause" for his failure to attend, the ALJ implicitly determined that Plaintiff's story of showing up for the hearing but not being allowed in was untrue, which she supported by noting that he never signed in "as per office policy" and no attempt was made to alert her that he had arrived, which was also contrary to office policy. (Id.) An ALJ may use "ordinary techniques" when determining whether to accept a plaintiff's subjective symptom statements, including consideration of the plaintiff's reputation for truthfulness and inconsistencies with the record. See Rounds, 807 F.3d at 1006; Thomas, 278 F.3d at 958-59.

Thus, the ALJ provided clear and convincing reasons to discount Plaintiff's subjective symptom statements, and remand is not warranted.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[37] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for payment of benefits or remand, and DISMISSING this action with prejudice.


DATED: June 28, 2019

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

---

[37] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."